United States District Court
Southern District of Texas
**ENTERED**
June 02, 2025
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| DULCICH, INC., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:23-cv-00405 |
| | § | |
| KOLT DAPRON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND RECOMMENDATION

There are two summary judgment motions pending before me in this trade secret misappropriation case. The first was filed by Defendant Kolt DaPron. Dkt. 61 (sealed); Dkt. 108 (redacted). The second was filed by Plaintiff Dulcich, Inc. d/b/a Pacific Seafood ("Pacific"). Dkt. 80 (sealed); Dkt. 106 (redacted). Having reviewed the briefing, the record, and the applicable law, I recommend that DaPron's motion be granted in part and denied in part, and that Pacific's motion be denied.

### BACKGROUND

Pacific distributes seafood products. In 2011, Pacific formed a subsidiary company, Galveston Shrimp Company, LLC ("GSC"). On June 11, 2020, DaPron signed an offer letter from Pacific and its subsidiaries, agreeing to work as an inside sales manager in Galveston. In that role, DaPron was responsible for managing all aspects of the day to day activities of the inside sales and customer service team. As an inside sales manager, DaPron had access to confidential information concerning Pacific's and GSC's finances and customers. Pacific insists that on June 10, 2020, DaPron signed a Conditional Offer of Employment with terms and conditions containing non-disclosure, non-solicitation, and exit-obligation provisions. DaPron disputes that he signed this document.

On December 4, 2023, DaPron resigned from Pacific. On that same day, DaPron began selling seafood under the name Seafood Isle, his own business

operating out of Galveston. Prior to resigning, DaPron emailed confidential documents and compilations such as a price list, budget, sales report, and software program to his personal email address. Pacific alleges that these documents qualify as trade secrets that DaPron improperly used and continues to use in his competing business, violating both federal and Texas law. Pacific also alleges that after starting his competing business, DaPron continued to contact and sell seafood to Pacific's customers in breach of his employment agreement and fiduciary duties. Pacific brings claims against DaPron for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and Texas Uniform Trade Secrets Act ("TUTSA"), breach of contract, tortious interference with prospective business relations and existing contracts, breach of fiduciary duty, and civil conspiracy.

DaPron has moved for summary judgment on all of Pacific's claims against him. Pacific has moved for partial summary judgment as to DaPron's liability on its breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and civil conspiracy claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "No genuine issue of material fact exists if the summary-judgment evidence is such that no reasonable juror could find in favor of the nonmovant." *Jenkins v. Methodist Hosp. of Dall., Inc.*, 478 F.3d 255, 260 (5th Cir. 2007).

"The moving party bears the initial burden of showing that there is no genuine issue for trial." *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). "[I]f the movant bears the burden of proof on an issue . . . , he must establish beyond peradventure all of the essential elements of the . . . [claim or affirmative] defense to warrant judgment in his favor." *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011) (cleaned up). Where

the movant does not bear the burden of proof, his burden is satisfied by showing that the other party has a "failure of proof on an essential element of its claim [or affirmative defense]." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020). A party makes this showing by introducing evidence or by "pointing out . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"If the [movant] succeeds on that showing, the burden shifts to the [nonmovant] to demonstrate that there *is* a genuine issue of material fact and that the evidence favoring the [nonmovant] permits a jury verdict in the [nonmovant]'s favor." *Joseph*, 981 F.3d at 329. The parties may satisfy their respective burdens "by tendering depositions, affidavits, and other competent evidence." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).

"The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "When parties file cross-motions for summary judgment, [I must] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (quotation omitted). "[I] must consider all of the evidence in the record, but [I] do not make credibility determinations or weigh the evidence." *Austin v. Will-Burt Co.*, 361 F.3d 862, 866 (5th Cir. 2004).

## ANALYSIS

### A.    TUTSA PREEMPTION OF COMMON LAW TORT CLAIMS

Before turning to the merits of Pacific's claims, I must address the fact that TUTSA preempts many of Pacific's claims, at least to the extent they turn on the misappropriation of trade secrets. TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for

misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code § 134A.007(a).[1] TUTSA's preemption provision "was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret." *Super Starr Int'l, LLC v. Fresh Tex. Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App.— Corpus Christi 2017, no pet.).

"TUTSA preemption analyses focus on the extent to which the asserted non-TUTSA state law claim is premised on the alleged use of trade secrets." *El Paso Disposal, LP v. Ecube Labs Co.*, No. EP-24-cv-97, 2025 WL 517656, at *15 (W.D. Tex. Feb. 17, 2025) (collecting cases). Thus, "the applicability of TUTSA's preemption provision turns on whether [Pacific]'s claims for breach of fiduciary duty, [tortious interference with existing contracts, tortious interference with business relations, and civil] conspiracy are based upon misappropriation of a trade secret as defined by the statute." *BKL Holdings, Inc. v. Globe Life Inc.*, 660 F. Supp. 3d 602, 608–09 (E.D. Tex. 2023) (quotation omitted).

### 1.    *The Breach of Fiduciary Duty Claim Is Partially Preempted*

Pacific argues that DaPron "breached [his] fiduciary duty to Pacific in three ways," by: (1) disclosing Pacific's confidential information and trade secrets to its competitors; (2) competing with Pacific in the same market while employed by Pacific; and (3) accepting a business loan to start a competing business while still employed by Pacific and without disclosing the loan to Pacific. Dkt. 106 at 26–27.

---

[1] Although DaPron did not raise TUTSA preemption as a reason to dismiss Pacific's tort claims in his summary judgment briefing, I recommend the court *sua sponte* find that DaPron is entitled to summary judgment, based on preemption, on Pacific's claims for breach of fiduciary duty, tortious interference, and civil conspiracy, to the extent those claims rely on the misappropriation of trade secrets. *See Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770–71 (5th Cir. 2000) ("[I]t is well-settled that a district court may grant summary judgment *sua sponte*, so long as the losing party has ten days notice to come forward with all of its evidence in opposition to summary judgment." (quotation omitted)). Pacific has 14 days to object to this Memorandum and Recommendation and explain why summary judgment should not be awarded to DaPron on these claims based on preemption. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2).

To the extent Pacific's "breach of fiduciary duty claim duplicates its alleged violation of the [TUTSA] . . . , the preemption provision in the [TUTSA] precludes [Pacific]'s breach of fiduciary duty claim." *Super Starr Int'l*, 531 S.W.3d at 843. Yet, the two remaining bases for Pacific's breach of fiduciary duty claim—both allegations of improper competition—are "not based on the unauthorized use of information, and therefore, [Pacific]'s breach-of-fiduciary-duty claim is not preempted by TUTSA to the extent that it is based on [those] allegation[s]." *ScaleFactor, Inc. v. Process Pro Consulting, LLC*, 394 F. Supp. 3d 680, 686 (W.D. Tex. 2019) (holding that allegations that employees "breached their duties to the company by acting for their own interests by creating a directly competitive business while working for [the defendant]" were not preempted by the TUTSA (cleaned up)). To the extent Pacific's breach of fiduciary duty claim is not preempted, it is discussed in the relevant section below.

### 2.    *The Tortious Interference Claims Are Partially Preempted*

Pacific alleges DaPron tortiously interfered with Pacific's existing contracts and business relationships with current customers by inducing its customers to reduce their business with Pacific. Pacific alleges DaPron's "acts are independently tortious in that, among other things, these acts constitute misappropriation of trade secrets[ and] breach of fiduciary duty." Dkt. 1 at 18. To the extent Pacific's tortious interference claims rely on the same facts underlying its misappropriation of trade secrets claims, the tortious interference claims are preempted. *See Stress Eng'g Servs., Inc. v. Olson*, No. H-21-3210, 2022 WL 4086574, at \*7 (S.D. Tex. Aug. 4, 2022) (finding that where plaintiff's tortious interference claim was "focused on [the defendant]'s inducement of [another] to misappropriate confidential, proprietary information," it "is exactly the sort of claim that the [court should] find preempted"). To the extent Pacific's tortious interference claims are not preempted, they are discussed in the relevant section below.

### 3.     *The Civil Conspiracy Claim Is Partially Preempted*

Pacific alleges that DaPron has engaged in a civil conspiracy to: (1) misappropriate Pacific's trade secrets and confidential information; (2) tortiously interfere with Pacific's contracts and prospective business relationships; (3) breach fiduciary duties owed to Pacific; and (4) engage in unfair competition with Pacific. To the extent Pacific's civil conspiracy claim is based on DaPron's misappropriation of trade secrets, the claim is preempted. *See BKL Holdings*, 660 F. Supp. 3d at 611 ("[A] civil conspiracy claim that is based on the misappropriation of trade secrets is preempted and should be dismissed."). To the extent Pacific's civil conspiracy claim is based on unfair competition or the non-preempted aspects of its breach of fiduciary duty and tortious interference claims, it is discussed in the relevant section below.

### B.     MISAPPROPRIATION OF TRADE SECRETS

Pacific brings claims against DaPron for misappropriation of trade secrets under DTSA and TUTSA. In its Motion for Partial Summary Judgment, Pacific argues that its "customer lists, budget reports, and sales sheets are trade secrets." Dkt. 106 at 31. Pacific claims it has continually taken steps to keep such information confidential and DaPron has misappropriated these trade secrets by intentionally using them to start a competing business. In response, DaPron argues that Pacific fails to: (1) show that it is the owner of the trade secrets at issue; (2) allege an injury to itself caused by any such misappropriation; or (3) show that DaPron used the trade secrets as required by statute. I need address only the third argument: whether DaPron *used* any trade secrets.

"Because the elements and definitions applicable to the DTSA and TUTSA are near identical, courts have addressed these claims together." *El Paso Disposal, LP v. Ecube Labs Co.*, No. EP-24-cv-97, 2025 WL 517656, at *9 (W.D. Tex. Feb. 17, 2025) (quotation omitted); *see also Vest Safety Med. Servs., LLC v. Arbor Env'l, LLC*, No. 4:20-cv-0812, 2022 WL 2812195, at *6 (S.D. Tex. June 17, 2022) ("Because the definitions of 'trade secret' in the DTSA and TUTSA are functionally

identical, the Court considers them together for purposes of summary judgment."
(quotation omitted)). To succeed on the merits of a misappropriation of trade
secrets claim under DTSA or TUTSA, Pacific "must show that (1) a trade secret
existed, (2) the trade secret was acquired through a breach of a confidential
relationship or discovered by improper means, and (3) [DaPron] *used* the trade
secret without authorization from [Pacific]." *CAE Integrated, L.L.C. v. Moov
Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022) (quotation omitted) (addressing
claims under DTSA and TUTSA simultaneously). I will assume, without deciding,
that Pacific's "customer lists, budget reports, and sales sheets are trade secrets."
Dkt. 106 at 31. I will also assume, without deciding, that Pacific is the beneficial
owner of these trade secrets and that DaPron misappropriated them. Even so,
there is no evidence in the record that DaPron *used* any trade secret.

DaPron testified that he did not use the budget reports or sales sheets. *See*
Dkt. 106 at 91 (denying that he used the budget sheet); *id.* at 95 (denying that he
used the sales sheet). Pacific fails to submit evidence to controvert DaPron's
testimony that he did not use the budget sheet or the sales sheet. In fact, the only
document that Pacific discusses DaPron *using* in the use section of its own motion
for summary judgment is Pacific's price list. *See* Dkt. 106 at 34–36. But there are
two problems with Pacific staking its misappropriation claims on DaPron's use of
the price list: (1) DaPron used only the *format* of the price list, and (2) the format
of the price list is not a trade secret. A comparison of Pacific's price list and
DaPron's price list shows that—while they have a nearly identical *format*—the
prices are not the same. *Compare* Dkt. 80-10 at 3 (sealed version of GSC's price
list), *with* Dkt. 80-11 at 2 (sealed version of Seafood Isle's price list). Accordingly,
there is no evidence that DaPron used the pricing information in Pacific's price
list—only its format.

As for the format of the price list, Pacific has done nothing to establish that
the price list itself is a trade secret, much less its format. *See* Dkt. 106 at 31–33
(failing to discuss the price list as one of its trade secrets alongside the customer

lists, budget sheets, and sales sheets). To qualify as a "trade secret," Pacific must establish that: (1) it "has taken reasonable measures under the circumstances to keep the information secret"; and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." Tex. Civ. Prac. & Rem. Code § 134A.002(6); *see also* 18 U.S.C. § 1839(3) (the federal definition is nearly identical). Yet, Pacific cannot establish either of these things. The format of Pacific's price list was not a secret—DaPron testified that he "would send it to . . . maybe one customer weekly." Dkt. 106 at 87. Moreover, because the format of the price list, which was sent to customers, was "readily ascertainable," Pacific cannot establish the second prong. Nor can Pacific explain how a document that was not secret and that "took [DaPron] probably . . . 20, 30 minutes to create," *id.* at 86, can have "independent economic value." § 134A.002(6)(B).

Pacific also argues that DaPron "was only able to [solicit Pacific's customers] because of his access and interaction with customers as a trusted employee of Pacific." Dkt. 106 at 35. To the extent Pacific is arguing that DaPron's solicitation of customers is evidence of his use of trade secrets, that argument fails. Pacific implicitly acknowledges that DaPron had pre-existing relationships with customers from when he "began working in the seafood industry in 2004 . . . for Bay Area Seafood in distribution and sales." Dkt. 107 at 9. "The mere fact of [DaPron]'s ability to compete does not itself suggest that [DaPron] did so by misappropriating trade secrets. . . . In any event, [DaPron] had previously worked with the customers at issue [at Bay Area Seafood], so the relationships were not entirely new." *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 326–27 (5th Cir. 2018). I will not "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action." *Id.* at 327. Because "there is no

evidence of actual use," DaPron is entitled to summary judgment on Pacific's DTSA and TUTSA claims.[2] *Id.*

## C.    BREACH OF CONTRACT CLAIM

Pacific asserts that DaPron breached certain covenants contained in his Conditional Offer of Employment. *See* Dkt. 106 at 46–49. Specifically, Pacific argues that DaPron: (1) failed to return Pacific's property after voluntarily terminating his employment; (2) disclosed and used Pacific's confidential and trade secret information; (3) solicited Pacific's customers and vendors; and (4) induced Pacific's customers and vendors to curtail or cancel their business with Pacific. In response, DaPron argues that: (1) Pacific fails to prove he signed the Conditional Offer of Employment; (2) Pacific does not have standing to assert a claim for damages or injuries sustained by GSC, a separate legal entity; and (3) the non-solicitation covenant in the employment agreement does not contain reasonable restrictions. I need to address only the first two of DaPron's arguments.

### 1.    *There Is a Genuine Dispute of Material Fact as to Whether DaPron Executed a Contract with Pacific*

"In Texas, the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (cleaned up). "The first of these elements—a valid contract—looks to the formation of the contract between the parties." *Ad-Wear & Specialty of Tex., Inc. v. Honeycomb Farms, LLC*, No. 01-18-00997, 2020 WL 1680051, at *5 (Tex. App.—Houston [1st Dist.] April 7, 2020, no pet.). A valid and

---

[2] The failure to point to any evidence of actual use is fatal to Pacific's Motion for Partial Summary Judgment. DaPron, however, does not rely on the absence of actual-use evidence as a basis for his own motion for summary judgment. Even so, as discussed in the preceding footnote, the court may grant summary judgment *sua sponte*. Thus, I recommend the court award summary judgment to DaPron on Pacific's DTSA and TUTSA claims because there is no evidence of actual use in the summary judgment record. Because there is no evidence of actual use, I have not addressed DaPron's arguments regarding ownership and damages.

binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Id.*

The parties do not dispute that there was an offer, acceptance, a meeting of the minds, and consent to accept employment. Indeed, DaPron readily acknowledges that he signed an offer letter on June 11, 2020. DaPron does, however, deny that he signed the Conditional Offer of Employment incorporating specific employment terms and conditions. *See* Dkt. 107 at 10; Dkt. 20 at 13. The Conditional Offer of Employment appears to reflect DaPron's electronic signature on June 10, 2020. *See* Dkt. 106 at 46. DaPron disputes the authenticity of this signature, however, arguing that he cannot have signed the Conditional Offer of Employment on June 10, 2020, because he didn't sign the offer letter until June 11, 2020. *See* Dkt. 107 at 69–70. In other words, DaPron argues that he cannot have signed the Conditional Offer of Employment "when [he] hadn't agreed to become an employee yet." *Id.* at 70.

The validity and enforceability of contracts executed electronically is governed by the Texas Uniform Electronic Transactions Act. *See* Tex. Bus. & Com. Code §§ 322.001–322.021. According to that statute,

> (a) An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.

> (b) The effect of an electronic record or electronic signature attributed to a person under Subsection (a) is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law.

*Id.* § 322.009. A "security procedure" is "a procedure employed for the purpose of verifying that an electronic signature, record, or performance is that of a specific

person or for detecting changes or errors in the information in an electronic record." *Id.* § 322.002(13).

To show that the electronic signature is attributable to DaPron, Pacific offers a declaration by Kaylee Case, Pacific's Human Resources Manager, detailing the electronic signature process and explaining that new employees create an account and password with their email addresses to access and sign documents. *See* Dkt. 87-2 at 2. According to Case, other employees and managers cannot access the accounts or override passwords and the software Pacific uses "collects timestamps relative to when a new team member completes the onboarding documents." *Id.* at 3. DaPron retorts that "Case cannot offer testimony as to what actually happened and how the system worked in 2020" because "Case was not present at the time to witness DaPron allegedly using the UKG software." Dkt. 101 at 3. Rather, DaPron has testified that Jessica Blythe, not Case, was the Human Resources representative present when DaPron signed the offer letter. *See* Dkt. 101-1 at 15. According to DaPron, "Ms. Case did not even work for Pacific Seafood in 2020 when the Conditional Offer of Employment was purportedly executed." Dkt. 101 at 3. I construe this as an objection that Case's declaration lacks foundation.

In her declaration, Case does not identify when she began working for Pacific or whether the onboarding process that she describes was the process being utilized at the time DaPron onboarded at Pacific. Case declares that "[o]nly someone with access to kadapron@aol.com would have been able to create an account and password," but she does not explain why kadapron@aol.com is a relevant email address. Dkt. 87-2 at 2. Case declares that Pacific's onboarding software "collects timestamps relative to when a new team member completes the onboarding documents," but she offers no timestamps for when DaPron signed the Conditional Offer of Employment. *Id.* at 3. This is insufficient evidence for Pacific to carry its burden to attribute the signature to DaPron.

In *Aerotek, Inc. v. Boyd*, the Texas Supreme Court held that an employer conclusively established attribution when it provided such timestamps. *See* 624

S.W.3d 199, 201 n.4 (Tex. 2021) ("From start to finish, the record shows that the Employees each took only a few minutes to complete the hiring application. For Cornett, timestamps show that he electronically signed the EDA on '11/15/16 11:29 PM' and the MAA on '11/15/16 11:56 PM'. He submitted his application for review on '11/16/16 12:15 AM'."). Merely referencing timestamps without actually providing them simply isn't enough to demonstrate the efficacy of Pacific's security procedures and attribute the June 10, 2020 electronic signature on the Conditional Offer of Employment to DaPron. Because Pacific has not shown that DaPron executed the Conditional Offer of Employment, Pacific is not entitled to summary judgment on its breach of contract claim.[3]

Even so, the fact that Pacific is not entitled to summary judgment on its breach of contract claim does not mean that DaPron *is* entitled to summary judgment. Although Pacific has not shown that it is entitled to judgment as a matter of law, it has put forth enough evidence to create a genuine dispute of material fact as to whether DaPron executed the Conditional Offer of Employment. Accordingly, DaPron is also not entitled to summary judgment on Pacific's breach of contract claim on the basis of contract validity. I must still address, however, the argument DaPron advances in his own motion for summary judgment that Pacific's breach of contract claim must fail due to Pacific's lack of monetary damages.

### 2. *Pacific Does Not Need to Prove Monetary Damages to Proceed with Its Breach of Contract Claim*

DaPron argues that Pacific's breach of contract claim must fail because Pacific has "not provided any evidence showing damage sustained by Pacific." Dkt.

---

[3] I do not reach DaPron's arguments about whether the Conditional Offer of Employment is enforceable as written. This argument was raised only in response to Pacific's motion for summary judgment, which I have already determined should be denied as to Pacific's breach of contract claim. Whether the non-solicitation provision should be reformed and whether DaPron breached the provision as reformed are issues best resolved at trial, assuming Pacific can first establish that DaPron signed the Conditional Offer of Employment.

108 at 15. Specifically, DaPron argues that an essential element of a breach of contract claim is proof of damages and Pacific is unable to prove any damages incurred by Pacific separate from the damages incurred by GSC. Monetary damages, however, are not the only damages Pacific seeks. Pacific also requests a permanent injunction to prevent DaPron from continuing to use its trade secrets.

"[M]oney damages are essential in contract claims seeking money damages (though not for contract claims seeking something else)." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 n.26 (Tex. 2009). "As long as there is injury from the breach, liability attaches under Texas law; the question whether that liability gives rise to the remedy of damages or some other remedy . . . is a matter for the law of remedies." *Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 859 (E.D. Tex. 2012), *aff'd*, 550 F. App'x 897 (Fed. Cir. 2014). "A claim for breach of contract in which actual damages are not the sole objective therefore does not fail because of the plaintiff's inability to prove monetary loss and entitlement to an award of damages." *Id.* Because Pacific seeks injunctive relief, its ability (or lack thereof) to prove monetary damages is not fatal to its breach of contract claim.[4] Accordingly, DaPron's argument that Pacific cannot prove monetary damages, even if true,[5] does not entitle him to judgment as a matter of law on Pacific's breach of contract claim.

---

[4] Pacific could also recover nominal damages. "When a plaintiff fails to prove actual damages resulting from a breach of contract, nominal damages are available upon proof of a contract and a breach thereof." *Ctr. Equities, Inc. v. Tingley*, 106 S.W.3d 143, 154 n.7 (Tex. App.—Austin 2003, no pet.).

[5] Pacific argues that damages to its subsidiary, GSC, are necessarily damages to Pacific. Not so. "[A] corporation cannot sue to recover costs incurred by its subsidiaries; a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent." *Mobius Risk Group, LLC v. Glob. Clean Energy Holdings, Inc.*, No. 4:10-cv-1708, 2011 WL 3568074, at *4 (S.D. Tex. Aug. 15, 2011) (quotation omitted); *see also Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) ("A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong.").

### D.    TORTIOUS INTERFERENCE CLAIMS

Pacific alleges that DaPron tortiously interfered with its existing contracts and prospective business relationships. DaPron does not dispute that he interfered with existing contracts or prospective business relationships. Rather, DaPron argues that Pacific's tortious interference claims fail because any damages resulting from his tortious interference belong to GSC and not Pacific.

To prevail on its claim for tortious interference with a contract, Pacific must establish: "(1) the existence of a valid contract subject to interference; (2) that [DaPron] willfully and intentionally interfered with the contract; (3) that the interference proximately caused the [Pacific]'s injury; and (4) that [Pacific] incurred actual damage or loss." *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). To prevail on its claim for tortious interference with prospective business relations, Pacific must prove that:

> (1) there was a reasonable probability that [Pacific] would have entered into a business relationship with a third party; (2) [DaPron] either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) [DaPron]'s conduct was independently tortious or unlawful; (4) the interference proximately caused [Pacific] injury; and (5) [Pacific] suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Both of Pacific's tortious interference claims require proof of actual damage or loss—in other words, monetary damages. *See Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) ("The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same *economic* position he would have been in had the contract interfered with been actually performed." (emphasis added)). Pacific claims it lost $171,622.28 in 2024 from customers who left Pacific and began doing business with Seafood Isle. DaPron contends that these damages belong to GSC and not

Pacific, and that because Pacific cannot show its own economic damage, its tortious interference claims must fail.

Pacific offers two retorts, neither of them availing. First, Pacific argues that DaPron "admitted in his deposition[] that he solicited at least 6 of Pacific's customer and converted them to customers of Seafood Isle" and that "Pacific had agreements with many of the customers that he converted to Seafood Isle." Dkt. 109 at 32. Second, Pacific contends that its "unrebutted expert report shows that Pacific has lost profits totaling $171,622.28 in 2024, attributable to DaPron's tortious interference of existing and prospective contracts." *Id.* at 33. Yet, even Pacific acknowledges—in a footnote on the same page—that "Pacific suffered damages as a result of lost profits *from its subsidiary, Galveston Shrimp Company.*" *Id.* n.100 (emphasis added). Moreover, the customers that DaPron ostensibly admitted belong to Pacific are listed in Pacific's expert's report as customers of GSC. *Compare* Dkt. 70-9 at 26–28 (discussing customers of GSC and Pacific), *with* Dkt. 61-8 at 7 (listing the customer's discussed in DaPron's deposition testimony as GSC's customers). Pacific has offered no proof of its own direct economic damages, and Pacific cannot claim GSC's damages as its own.

"Courts that have addressed [whether or when a parent company may recover damages incurred by its subsidiaries] have consistently held that a parent may not do so." *Mobius Risk Group*, 2011 WL 3568074, at *5 (collecting cases). As the Fifth Circuit has explained:

> [I]t is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership.

*Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957); *see also Chartis Specialty Ins. Co. v. Tesoro Corp.*, 930 F. Supp. 2d 653, 667 (W.D. Tex. 2013) (rejecting the

"argument that a parent company can recover damages for losses suffered by a subsidiary"). Because Pacific's only evidence of actual damages shows that the damages belong to GSC, DaPron is entitled to summary judgment on Pacific's tortious interference claims.

## E.   BREACH OF FIDUCIARY DUTY

Pacific claims that DaPron breached his fiduciary duty to Pacific by: (1) disclosing Pacific's confidential information and trade secrets to its competitors at Seafood Isle; (2) competing with Pacific in the same geographical market for the same customers while employed by Pacific; and (3) accepting an $80,000 business loan to start a competing business while he was still employed with Pacific. In response, DaPron argues that Pacific's claim should fail because (1) any damages caused by his breach belong to GSC and not Pacific; and (2) any fiduciary duty he had was owed to GSC and not Pacific.

To prevail on its breach of fiduciary duty claim, Pacific must show: "(1) a fiduciary relationship between [Pacific] and [DaPron], (2) a breach by [DaPron] of his fiduciary duty to [Pacific], and (3) an injury to [Pacific] or benefit to [DaPron] as a result of [DaPron]'s breach." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied.). "In Texas, a fiduciary relationship is an extraordinary one and will not be lightly created." *Chapman Child.'s Tr. v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 439 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). "The Texas Supreme Court" has "held that a trusted salesman occupie[s] the relationship of a fiduciary to his employer." *Salas v. Total Air Servs., LLC*, 550 S.W.3d 683, 692 (Tex. App.—El Paso 2018, no pet.) (quotation omitted). "An employee has a duty to act primarily for the benefit of his employer in matters connected with his employment." *Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 762–63 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Accordingly, "[a]n employee may not (1) appropriate the company's trade secrets; (2) solicit the former employer's customers while still working for his employer; (3) solicit the

departure of other employees while still working for his employer; or (4) carry away confidential information." *Id.* at 763.

To the extent Pacific's breach of fiduciary duty claim turns on DaPron's misappropriation of trade secrets, such a claim is plainly preempted by TUTSA. Thus, for the discussion to follow, the only possible bases for Pacific's breach of fiduciary duty claim are DaPron's pre-termination solicitation of customers and acceptance of an $80,000 business loan to begin Seafood Isle.

### 1.    *Pre-termination Solicitation of Customers*

Pacific argues that DaPron breached his fiduciary duties by soliciting Pacific's customers while still employed at Pacific. To support its claim, Pacific relies on DaPron's communications with Pacific's customers prior to and on December 4, 2023. It is not clear what time of day DaPron resigned from Pacific on December 4, 2023, but by 7:00 AM, DaPron had turned in his Pacific-issued computer. *See* Dkt. 106 at 135. Thus, DaPron's communication with customers after 7:00 AM on December 4th does not constitute communication made *while employed for Pacific* as required to prove that DaPron breached his duty of loyalty. *See Wooters*, 513 S.W.3d at 763 ("[T]here was no breach of fiduciary duty when employee formed competing business while employed but did not compete with employer until he resigned.").

DaPron argues that he did not begin making phone calls to customers on behalf of Seafood Isle until after he left Pacific. DaPron admits, however, that prior to ending his employment with Pacific, he told several Pacific customers of his plans to leave and start his own business. *See* Dkt. 107 at 71. Specifically, DaPron told these customers that he planned to leave Pacific and work with one of GSC's customers, Jason Robert. *See id.* at 72. DaPron denies soliciting those customers to purchase seafood at that time. *See id.* at 73. DaPron agrees though, that he "made it clear on those phone calls that [he] would be moving forward with a new business that sold seafood" and that "the purpose" of those calls was to let Pacific's customers know that he was "someone they could buy seafood from." Dkt. 106 at

118. This is the only evidence Pacific offers to prove that DaPron solicited customers while employed.

DaPron's bare testimony regarding "the purpose" of his phone calls to customers is insufficient to prove that DaPron actively solicited customers.

> The commonly understood meaning of the term "solicit" is to make petition to: entreat, importune, concern; to approach with a request or a plea (as in selling or begging); to move to action; serve as an urge or incentive: incite; to strongly urge (as one's cause or point): insist upon; to endeavor to obtain by asking or pleading; and to seek eagerly or actively. Put another way, the commonly understood meaning of "solicit" includes more than merely to ask.

*Providence Title Co. v. Truly Title, Inc.*, No. 4:21-cv-147, 2024 WL 3927538, at *6 (E.D. Tex. Aug. 22, 2024) (quotation omitted). Not only does Pacific fail to provide evidence of DaPron "begging" customers for their business, but Pacific fails to show even one occasion where DaPron "merely" *asked* Pacific customers to purchase from him. *Id.* DaPron's informing Pacific's customers of his plans to leave Pacific and start a competing seafood business was not solicitation because there is no evidence that DaPron requested the customers' business or attempted to sell them seafood on behalf of Seafood Isle. *Compare Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (finding no solicitation where the defendant simply "mentioned that he would like to start his own company, and just briefly broached the subject of hauling for [his current employer's customer] some day" but "there was no testimony that [the defendant] sought or obtained a commitment from [that customer]" (quotation omitted)), *with Salas*, 550 S.W.3d at 694 (defendant's submission of a competing bid against his employer while still employed constituted solicitation).

The record is devoid of evidence suggesting that DaPron solicited Pacific's customers to purchase seafood from Seafood Isle while employed by Pacific, or that DaPron submitted competing prices and product offerings to Pacific customers while employed by Pacific. Accordingly, Pacific's breach of fiduciary duty claim, based on DaPron's alleged pre-termination solicitation of customers, fails.

### 2. *DaPron's Acceptance of a Business Loan*

Pacific also argues that DaPron breached his fiduciary duty to Pacific by: (1) opening a bank account for his competing business while still employed by Pacific; and (2) accepting an $80,000 loan from Pacific's customer, Jason Robert, to start a competing seafood business prior to DaPron terminating his employment with Pacific. DaPron retorts that these were permissible steps taken in preparation to form a competing business, and that he had no obligation to inform Pacific that he was preparing to open a competing business.

DaPron testified that, as early as June 2023, he and Robert discussed DaPron leaving Pacific. *See* Dkt. 107 at 50. Since 2022, Robert's company would buy product and store it in Pacific's cold storage for a fee until the product sold. DaPron testified that he and Robert agreed, prior to DaPron resigning from Pacific, that DaPron would work for Robert after DaPron's employment with Pacific ended. *See id.* at 51. The terms of the agreement were not formally executed between DaPron and Robert, but they had an oral agreement that Robert would "financially back" DaPron. Dkt. 106 at 81. "Shortly before [DaPron] left" GSC, Robert loaned DaPron $80,000 so DaPron could "get started" buying and selling seafood. *Id.*

As the Texas Court of Appeals has explained:

> A fiduciary relationship . . . does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties. An at-will employee may properly plan to compete with his employer, and may take active steps to do so while still employed. The employee has no general duty to disclose his plans.

*Abetter Trucking*, 113 S.W.3d at 510 (cleaned up). In *Abetter Trucking,* the court acknowledged that for the defendant "[t]o form his own company, [he] had to incorporate or otherwise establish a business entity, obtain permits, and obtain insurance. These were permissible preparations to compete, not breaches of a fiduciary duty." *Id.* at 511; *see also Salas*, 550 S.W.3d at 694 (preparatory actions such as "obtaining a license, or filing an assumed name certificate" are permitted). Along the same lines, obtaining financing and opening a bank account are

necessary steps to form a business and constitute permissible preparatory acts. "There is nothing legally wrong in . . . preparing to compete before the employment terminates." *Abetter Trucking*, 113 S.W.3d at 510. Pacific has not provided, and the court has not found, any caselaw suggesting that an employee breaches his fiduciary duty to his employer by obtaining financing to start a competing business venture while still employed. To the extent Pacific would argue that Robert's status as Pacific's customer changes the calculus, such an argument would be unpersuasive. The record shows that Robert is the one who offered to help DaPron, not that DaPron solicited Robert. *See* Dkt. 106 at 112 (DaPron testifying that "[Robert] offered to help me financially to get started, get going").

Because there is no evidence that DaPron breached a fiduciary duty by soliciting customers or taking impermissible preparatory steps, Pacific is not entitled to summary judgment on its breach of fiduciary duty claim. As for whether DaPron is entitled to summary judgment, DaPron moves for summary judgment on Pacific's breach of fiduciary duty claim solely on the basis that Pacific cannot show an injury. This is not a persuasive argument because "an agent [can]not escape liability for, and retain the profits from, breaching the duty of loyalty to a principal simply because the principal might not be able to prove that the breach caused damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). Even so, as discussed above, the court may recommend summary judgment *sua sponte* on any basis. The court should grant summary judgment in DaPron's favor on Pacific's breach of fiduciary duty claim because there is simply no evidence of breach anywhere in the record.

## F.   CIVIL CONSPIRACY

Pacific argues that DaPron and Robert conspired to compete with Pacific by misappropriating Pacific's trade secrets and forming a relationship that breached DaPron's fiduciary duties to Pacific. "[C]ivil conspiracy is not an independent tort." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). "[A] civil conspiracy claim is connected to the underlying tort and survives or fails

alongside it." *Id.* at 141. Because all of Pacific's tort claims—to the extent they are not preempted by TUTSA—fail on the merits, Pacific's civil conspiracy claim necessarily fails.

## CONCLUSION

For the reasons discussed above, I recommend that DaPron's Motion for Summary Judgment (Dkt. 61) be granted as to Pacific's claims for misappropriation of trade secrets under DTSA and TUTSA, tortious interference, breach of fiduciary duty, and civil conspiracy, but denied as to Pacific's breach of contract claim. I recommend that Pacific's Motion for Summary Judgment (Dkt. 80) be denied in all respects.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this _____ day of June 2025.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE